EYLeetrialmemo3

LEONARDO M. RAPADAS
United States Attorney
KARON V. JOHNSON
Assistant U.S. Attorney
Suite 500, Sirena Plaza
108 Hernan Cortez Avenue
Hagatna, Guam 96910
Telephone: (671) 472-7332
Telecopier: (671) 472-7334

Attorneys for the United States of America

IN THE UNITED STATES DISTRICT COURT

FOR THE TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CRIMINAL CASE NO. 08-00004 |
| Plaintiff, ) | |
| vs. ) | **UNITED STATES RESPONSE TO** |
| ) | **DEFENDANT'S MEMORANDA** |
| EUN YOUNG LEE, ) | |
| aka Eun Young Cho, ) | |
| aka Ina Lee, ) | |
| MARCELINO J. LASERNA, ) | |
| JOHN W.C. DUENAS, ) | |
| MARY C. GARCIA, ) | |
| JOSEPH PANGELINAN, ) | |
| FRANCISCO SN KAWAMOTO, and ) | |
| MARGARET B. UNTALAN, ) | |
| Defendants. ) | |

## I. JURY INSTRUCTIONS

The government agrees that jury instructions must await the end of the trial. The purpose of a trial memorandum is simply to alert the court to issues which, if raised, will require certain particularized instructions. Deliberate ignorance appears to apply to defendants' conduct, if Ina Lee was truthful in the statement she made to FBI S/A Ferguson on November 8, 2005:

> "LEE is not paying anyone at [MVD] to help her secure Guam driver's licenses. LEE has befriended many GMVD employees by making Korean food for them and attending rosaries and the like. The GMVD employees, in turn, help LEE by just accepting her client's documents without scrutinizing them. They do this for her because they know her."

The evidence will show the six MVD examiner-defendants knew Lee was submitting applications which contained false information, including false Taxpayer Identification Numbers. (The terms "TIN" or Individual Taxpayer Identification Number, "ITIN," both refer to the taxpayer identification numbers issued by IRS and are used interchangeably). They accepted these applications without the required supporting documents, and entered her "clients" into the MVD computer without any scrutiny. An ignorance defense may apply if the defendants say they did not <u>know</u> the applications were false because they did not read them, or demand the usual supporting documents. It all depends on how the case proceeds at trial.

Defendants are wrong, however, when they contend that a deliberate ignorance instruction only applies to drug charges. The instruction applies to every sort of offense. <u>United States v. Kelm</u>, 827 F.2d 1319 (9th Cir. 1987), for example, concerned income tax fraud.

Defendants are also wrong to alleged that the government asserted in its trial brief that <u>United States v. Heredia</u>, 483 F.3d 913 (9th Cir. 2007) overruled <u>United States v. Jewell</u>, 632 F.2d 697 (9th Cir. 1976 (en banc). What the government said was, <u>Heredia</u> "has overruled an extensive body of case law which evolved after the original <u>Jewell</u> decision." This was based upon the very words of the Ninth Circuit concerning whether motive was a required element of a deliberate ignorance instruction:

> "We conclude, therefore, that the two-pronged instruction given at defendant's trial met the requirements of <u>Jewell</u> and, to the extent some of our cases have suggested more is required, *see* page 920, *supra*, <u>they are overruled</u>." <u>Id.</u> at 920. (Emphasis added.).

Thus, if this instruction is ultimately given to this jury, the court cannot add the element, that the defendants motive in deliberately failing to learn the truth was to give themselves a defense in case they were ever charged with a crime.

## II. UNCHARGED CONDUCT

The government has identified several other applications which were submitted by Lee, which are not part of the present charge. Given that it will take months to verify the relevant

-2-

TINs through the IRS, however, these applications will not be mentioned in this trial. Thus, the only uncharged conduct relates to two applications processed by Vicente Pablo, Kyoung Kwa BAEK (#29) and Young Hee LEE (#28), in August, 2004. On December 24, 2007, Lee identified these two applications as among those she submitted using fraudulent TINs. The government had deferred the investigation against Pablo until these people could be located and interviewed. Two weeks ago, Young Hee LEE was arrested, and the government anticipates renewing its investigation soon. The government believes testimony on these two applications is admissible against Lee, because they are in inextricably intertwined with the other charges she is facing.

### III. PUBLICATION OF TAX DATA

Title 26, United States Code, § 6103(a) prohibits the IRS from releasing tax data or tax returns. When this investigation started, the government had to obtain court orders, as required by 26 U.S.C. § 6103(i)(1)(A), before the IRS could release this data to federal investigators. The IRS documents consisted of a list of TINs which were fictitious, and the W-7 applications and internal IRS computer printouts identifying the names of the real people who possessed some of the TINs which the government was investigating. The government investigated 75 suspected fraudulent licenses and has identified 54 to date (in addition to the one issued to Mike Park). Some of the TIN records it received were legitimate and hence, not pertinent to this case. The records which do apply to this indictment are contained in Exhibit 13, with the name of the TIN holder, and other personal information redacted to preserve that person's privacy.

The government secured an order from this court, pursuant to 26 U.S.C. § 6103(i)(4)(A), so that it could provide each defense counsel with the IRS documents. That order is attached hereto as Exhibit 1.

Now, defendant Untalan has published some of those tax records. Her exhibit U-F contains the name and date of birth of the person whose TIN was used by Ji Eon Lee(75) to obtain a license in January, 2005.

-3-

Untalan's exhibits U-Q, U-R, U-S, and U-T display the names, dates of birth and TINs belonging to persons living on Guam, who are not referenced in this indictment. They appear to be persons for whom Lee obtained legitimate TINs, until December 17, 2003, when the IRS changed its procedure to require that a 1040 tax return be filed with the W-7 TIN application. The driver's licenses obtained in 2003 using these earlier TINs are legitimate, and have no connection to the charges before this court.

Whether defendant has violated the Privacy Act of 1974 (5 U.S.C. 522a) is a matter between her and the people whose privacy she has invaded. As it concerns this trial, it serves no purpose to publish this private information. Accordingly, the government objects to the use of these documents as trial exhibits, and suggests that the court order her to redact them in the manner commonly employed for such private information, as illustrated by government's Exhibits 13 and 14.

For the same reason, the court should allow the redacted tax information as shown on Exhibits 13 and 14. All counsel have had the opportunity to verify that it is correct, and the biographical information of these people is not pertinent to any matter at issue here.

## IV. SUMMARIES AND A LIMITING INSTRUCTION

The government's trial memorandum addressed the admissibility of Exhibit 14 (and necessarily Exhibits 68-73, which are break-outs by examiner). These are the only summaries being offered under FRE 1006.

Exhibit 13, as stated above, concerns IRS records, which will be identified as business records by Francine Prince of the IRS. Exhibits 2, 3, 4, 5, and 6 are business records which will be identified by the Guam Rev & Tax computer analyst, Christine San Augustine. Ms. San Augustine will explain the software programs associated with the issuance of Guam driver's licenses: the information entered in the computer when an application is accepted, the successive entries made by various personnel, and the data entered when the applicant finally gets his operator's or chauffeur's license. This information can be retrieved by designated fields. Thus,

Exhibit 2 is a retrieval by TIN of <u>all</u> the driver's licenses entered into the computer between January 1, 2002, and January 18, 2006. That is, of all the people who used a TIN, rather than a social security number, on their application. Exhibit 3 is a run of the same data, using the "exam" field. Ms. San Augustine will explain how each line represents data entered every time an applicant takes a test. Exhibit 4 is a run using the address field, Exhibit 5 lists the codes assigned to various actions, and Exhibit 6 is a history of the particular applications charged in this indictment, run by "record key," the unique number assigned to every application added to the system. The admissibility of computer printouts was specifically approved in <u>United States v. Catabran</u>, 836 F.2d 453 (9th Cir. 1988).

Defendants object to the government's summary exhibits on the grounds that the government has not included every license processed by every examiner between 2002 and 2006. Given that these specific charges concern false <u>TINs</u> used by Korean citizens, licenses issued according to social security number, for example, would be irrelevant. Defendants fail to cite any authority which requires the government to offer evidence not directly pertinent to the charges it has brought.

The authority cited by defendants is not relevant. It is routine for parties to produce charts and summaries which explain and bolster their theory of the case. These summaries are to persuade the jury that their theory is correct, and are not admissible. FRE 1006 concerns a different kind of exhibit:

> "The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court."

The rule applies only to documents and photographs, and it does not require the documents themselves to be entered into evidence. It does not permit the addition of materials extraneous to the records themselves, nor does it permit any summary of witnesses or explanations of legal theories.

Exhibits 14 is purely a summary of the records in Exhibits 2-6 and 13; it does not contain anything other than that data. If Exhibit 14 is not admitted, Ms. San Augustine will have to go through each computer printout, reading into the record, 55 times for each exhibit, the content related to the charged offenses, line by line. This surely qualifies as evidence which cannot be conveniently presented in court.

The cases cited by the defense are not on point, because they do not involve FRE 1006 and the summary of voluminous data. <u>United States v. Wood</u>, 943 F.2d 1048, 153 (9th Cir. 1991, for example, upheld the admissibility of government charts which summarized the expert testimony of an IRS agent during a prosecution for tax fraud. The charts were data summaries, but configured to support his expert opinion. Although <u>Wood</u> cited FRE 1006, in fact the exhibits were not simply a voluminous summary of data. The authorities cited by <u>Wood</u> as precedent did not rely upon FRE 1006 at all. <u>United States v. Abbas</u>, 504 F.2d 123 (9th Cir. 1974) concerned a summary of witnesses' testimony, not documents, and does not cite FRE 1006. <u>United States v. Soulard</u>, 730 F.2d 1292 (9th Cir. 1984), involved a false corporate tax case tried on the "bank deposit method" to determine whether the defendant had under-reported his income. The government had introduced voluminous bank records as evidence and was permitted to use a summary chart during argument. It appears, however, that the summary was not of the bank records data, but of the government expert's explanation of how the "bank deposit method" was analyzed. Again, the court did not cite FRE 1006 in its decision.

Likewise, <u>United States v. Poschwatta</u>, 829 F.2d 1477 (9th Cir. 1987) (overruled on other grounds), concerned the admissibility of exhibits showing the schedules of income for the defendant, for the three years he was charged with tax fraud. Again, the exhibit was not a summary of voluminous data. Nevertheless, the court held the exhibit was admissible:

> "The figures in the government chart were admitted into evidence and the defendant did not challenge the figures. Defendant also had a full opportunity to cross-examine the witness. The charts arguably contributed to the clarity of the presentation to the jury and were a reasonable method of presenting evidence." <u>Id.</u> at 1481.

-6-

The court made this ruling, however, without any reference to FRE 1006.

United States v. Catabran, 836 F.2d 453 (9th Cir. 1988), is directly on point. The defendant was charged with bankruptcy fraud for concealing assets of his waterbed company, "Bedder Nights." The allegation were that he transferred its assets into a new company before Bedder Nights went into Chapter 7. To prove that the old company had a large inventory, the government introduced general ledger computer printouts, and a chart summarizing the inventory data. The court affirmed his conviction, holding the computer records were admissible as business records, and the summary admissible pursuant to FRE 1006.

Whether to admit an exhibit which summarizes evidence already in the record is up to the sound discretion of the trial court. In United States v. Boulware, 470 F.3d 931 (9th Cir. 2006), vacated on other grounds, 128 S.Ct. 1168 (2008), the government had charged tax fraud for assets the defendant had diverted from his corporation and which he contended were nontaxable returns of capital rather than income. Boulware approved the admission of government charts summarizing the financial transactions over the relevant period. The underlying data was admissible, there was no dispute as to the charts' accuracy, the summary witness was available for cross-examination, and there was a limiting instruction.

The general rule is set forth in 29A Am.Jur.2d Evidence § 1061. Summaries are allowed as evidence when the underlying documents cannot be conveniently examined.

> "Where the underlying documents are introduced as well as the summaries, the court may instruct the jury that the summaries (and the witness' explanation of them) are not evidence in and of themselves and that if the summaries do not correctly reflect the underlying evidence the jury should disregard them."

United States v. Green, 428 F.3d 1131 (8th Cir. 2005) illustrates this procedure. Defendant was charged with social security fraud, for purchasing computers with stolen identities. The government introduced voluminous records from the companies defrauded. The court allowed the introduction of four charts, which summarized the data by individual transactions and by total transactions in spreadsheet format. The Eighth Circuit upheld the

-7-

admission of these charts. It noted with approval that the trial judge had given a limiting instruction, as follows:

> "You may use these summaries or charts as evidence. It is for you to decide how much weight, if any, you will give to them. In making that decision, you should consider all the testimony you heard about the way in which they were prepared." Id. at 1133.

Accordingly, Exhibit 14 (and 68-73) should be admitted as evidence, with a limiting instruction such as that given in Green.

## V. ADMISSIBILITY OF CO-DEFENDANTS STATEMENTS

Although his memorandum appears to concern conspiracy, Pangelinan asserts as p. 3 that the government intends to introduce Lee's statements concerning her co-defendants. To the contrary, the government trial brief dealt with the issue of which exculpatory and incriminating statements should be admitted. The statements of all the co-defendants are set forth in Exhibits 16 through 30 of its trial brief, redacted by high-lighting the portions of the statements which it believes admissible. The permitted testimony of the respective FBI agents should be resolved prior to their taking the stand.

A. There appear to be no Bruton objections

The government's proposed redacted interviews have removed some statements which are obviously prohibited by Bruton v. United States, 391 U.S. 123 (1986). For example, in the last paragraph of Exhibit 16, Lee admitted that her co-defendants were accepting her clients' applications without scrutiny, because they were friends. This clearly is not admissible during the government's case in chief. This holds true for Laserna's confession in Exhibit 20. Laserna admitted knowingly taking copies from Lee, but blamed Mary Garcia, who told him to accept them. In Exhibit 22, Laserna admitted that anyone other than Lee would have been rejected, had they failed to present original supporting documents. He then added that the other examiners were also accepting Lee's copies. His remark concerning the conduct of other examiners is another obvious Bruton problem.

On the other hand, the government may introduce other statements, to which the

-8-

defendants have not objected. Absent any such objections, the government assumes that defendants agree they do not involve <u>Bruton</u>. In particular, the government may introduce the following testimony from Exhibit 17. In the last paragraph of page 2 of her December 24, 2007, interview, Lee said that she had tried submitting copies of ITINs in the new format instituted by the IRS after December 17, 2003: the letters were typed on paper which had "void" embedded in it, so that a person could not hope to pass off a copy for an original. Lee said that the examiners had rejected such patently phoney letters when she submitted them. This is evidence the defendants knew that Lee was trying to get driver's licenses by using false ITINs.

## VI. HEARSAY

Defendants do not dispute that the last paragraph of Lee's December 24, 2007, statement, (Exhibit 17, p. 3) is hearsay. It is an out-of-court statement which cannot be used as evidence for the truth of the matter asserted, that Lee's co-defendants did not know her ITIN letters were fakes.

Defendants do not dispute the rule that exculpatory statements are inadmissible hearsay under FRE 801(d)(2). Nor do they dispute the holding of <u>Williams v. United States</u>, 512 U.S. 594 (1994), that if the defendant makes both incriminating and exculpatory statements, intermixed, the statement must be redacted. Rather, they assert that the statements are all either one or the other, and hence are 100% admissible or 100% excludable.

Whether a statement is incriminating depends on the nature of the government's case. The statement "I was standing outside the front entrance of K-Mart at midnight on May 1" may be incriminating if police are investigating a murder which occurred outside the front entrance of K-Mart at midnight on May 1. On the other hand, if police are investigating a murder at that time and date which occurred elsewhere, the statement is exculpatory.

The government's prosecution is mirrored in Lee's confession: that the same rules which obtained to everyone else, did not apply to her. For her, the defendants waived the rules, and accepted her clients' applications without any scrutiny, and without requiring her clients to have

-9-

the original documents which everyone else had to produce. Her co-defendants knew they were violating the rules, that they had no authority to give Lee special treatment. Hence, they were knowingly producing driver's licenses unlawfully.

Laserna ultimately confessed to this offense. As did the other examiners, he knew an original SS or TIN document was mandated, yet he knowingly exempted Lee from this requirement (but it was at Mary Garcia's direction). The other defendants, however, all denied ever accepting copies of TINs from anyone, including Lee. Their statements are incriminating because they demonstrate defendants knew the rules. They are also incriminating if the government proves they are lies, that the defendants denied giving Lee special treatment in an effort to avoid prosecution.

Whether they were being paid by Lee is irrelevant. Although motive is a useful indicia of guilt, it is not required for a prosecution under 18 U.S.C. § 1028. All the government has to prove is that the defendants were knowingly violating MVD's rules to produce driver's licenses for Lee. It does not have to prove why they did it.

## VII. CONSPIRACY

The government generally agrees with the memorandum filed by Mary Garcia, with the exception of her conclusion. The government does not have to prove defendant knew a particular course of conduct was illegal: ignorance of the law is no defense.

Defendant Pangelinan's memorandum is also incorrect in its conclusion that a conspiracy must be established before the co-conspirators' statements can be "introduced." The government must prove a conspiracy exists before the statements of co-conspirators can be considered as evidence, i.e., before they can go to a jury. The statements can be introduced conditionally, pending a ruling that the conspiracy has been independently proven.

No one disputes that statements by co-conspirators in furtherance of a conspiracy are admissible under FRE 801(d)(2)(E). "The declarant's intent and not the actual effect is what is important. ... While mere conversations or narrative declarations are not admissible under this

-10-

1 rule, statements made to induce enlistment, further participation, prompt further action, allay
2 fears or keep coconspirators abreast of an ongoing conspiracy's activities are admissible.
3 United States v. Arias-Villaneuva, 998 F.2d 1491, 1502 (9th Cir. 1993). Thus, the statements of
4 persons recruiting customers for Lee are in furtherance of the scheme because they are made
5 with the intent to enlist further customers.

6       Whether statements are made in furtherance of a conspiracy naturally depends on what
7 conspiracy is charged. The parameters of the conspiracy are defined by the indictment. The
8 indictment defines this conspiracy as one between Lee, the MVD examiners, and the persons
9 illegally purchasing Guam driver's licenses. Thus, any statements made by Lee or other persons
10 in furtherance of the scheme to unlawfully purchase Guam licenses, are admissible. Each of the
11 licenses purchased is alleged as an overt act made in furtherance of the scheme. The government
12 must prove at least one overt act to support a conviction on each conspiracy. Therefore,
13 statements made to further the commission of an overt act are necessarily made in furtherance of
14 the conspiracy.

15       The evidence will show that Lee and each of the charged examiners had an agreement, to
16 produce driver's licenses unlawfully. Each examiner's role in the conspiracy was to facilitate
17 this production by accepting Lee's applications without question, and without requiring the
18 supporting documents everyone else had to submit. This agreement allowed Lee to recruit
19 buyers, charge them a fee, and successfully obtain 54 illegal licenses over a 22-month period.
20 Frequently, the license purchaser was referred to Lee by a friend, who contacted Lee and paid
21 her money on behalf of the buyer. The buyers and their friends joined that conspiracy when they
22 paid Lee to obtain an illegal license from that examiner.

23       Dong Sik Jung is a typical example; his conduct is charged as an overt act in ¶ 57. Jung
24 came to Guam to start a business with a Mr. Suh, who secured an apartment for Jung in the Pia
25 Marine, where Suh lived with his wife Ji Eon Lee. Jung overstayed his tourist visa and remained
26 on Guam illegally. When he told Suh he wished he could get a driver's license, Suh said it

-11-

would be easy, that his wife was getting one and he could help Jung get one also. Jung paid Suh $1,000. On January 18, 2005, Ji Eon Lee drove Jung to the old MVD, where they met Eun Young Lee. She took them inside and filled out driver's license applications for both. Then she took them up to the window, where defendant Untalan was on duty. Lee gave Untalan both applications, the subjects' passports and their Korean driver's licenses. She did not give Untalan any TIN or SS documents, neither originals nor copies. Untalan processed the applications without question. On January 22, 2005, Ji Eon Lee drove Jung to the UOG, where they took the written test, in Korean, and passed. On January 27, 2005, Ji Eon Lee drove Jung to the MVD, where Lee got her license. Jung, however, had forgotten his glasses, and had to go back later.

Thus, there were five conspirators to the crime of unlawfully producing a driver's license for Jung: Ina Lee, Untalan, Ji Eon Lee, Suh, and Jung himself. The statement made by Suh, that Jung could obtain a driver's license for $1,000, was made in furtherance of the charged conspiracy, i.e., in furtherance of unlawfully securing a license for Jung. Hence, it is admissible.

Defendants confuse the nature of these statements with the question whether a conspiracy can be proved independently of the statements. The statements are clearly in furtherance of the charged conspiracy. If the government fails to present independent evidence of the conspiracy alleged in the indictment, then necessarily the jury must be instructed to disregard the statements. But that comes at the end of the government's case; it does not affect the admissibility of these statements at the beginning.

Respectfully submitted this __27th__ day of May, 2008.

                                           LEONARDO M. RAPADAS
                                           United States Attorney
                                           Districts of Guam and NMI

By:   /s/ Karon V. Johnson
       KARON V. JOHNSON
       Assistant U.S. Attorney

-12-